IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
7:16-CV-242-FL

| | | |
|---|---|---|
| THADDIUS A. WATKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Thaddius A. Watkins ("plaintiff" or, in context, "claimant") challenges the final decision of defendant Acting Commissioner of Social Security Nancy A. Berryhill ("Commissioner") denying his applications for a period of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") on the grounds that he is not disabled.[1] The case is before the court on the parties' motions for judgment on the pleadings. D.E. 21, 23. Both filed memoranda in support of their respective motions. D.E. 22, 24. The motions were referred to the undersigned magistrate judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). *See* 27 Dec. 2016 Text Ord. For the reasons set forth below, it will be recommended that the Commissioner's motion be allowed, plaintiff's motion be denied, and the final decision of the Commissioner be affirmed.

---

[1] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same. The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416. The versions of the regulations cited herein are those in effect at the time of issuance of the decision of the administrative law judge ("ALJ").

## I. BACKGROUND

### A. Case History

Plaintiff filed applications for DIB and SSI on 19 July 2012, alleging in both applications a disability onset date of 14 July 2012. Transcript of Proceedings ("Tr.") 159. These applications were denied initially and upon reconsideration, and a request for hearing was timely filed. Tr. 159. On 14 January 2015, a hearing was held before an administrative law judge ("ALJ"), at which plaintiff and a vocational expert ("VE") testified. Tr. 175-97. In a written decision dated 13 February 2015, the ALJ found that plaintiff was not disabled and therefore not entitled to DIB or SSI. Tr. 159-69. Plaintiff timely requested review by the Appeals Council. Tr. 154-55. On 14 May 2016, the Appeals Council denied admission of additional evidence submitted by plaintiff (Tr. 2, 8-137, 145-53) and denied the request for review (Tr. 1). At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. On 1 July 2016, plaintiff commenced this proceeding for judicial review of the ALJ's decision, pursuant to 42 U.S.C. §§ 405(g) (DIB) and 1383(c)(3) (SSI). *See* Mot. for Leave to Proceed *In Forma Pauperis* ("IFP") (D.E. 2); Am. IFP Mot. (D.E. 7); Ord. Granting Am. IFP Mot. (D.E. 9); Compl. (D.E. 10).

### B. Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see id.* § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are

of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see id.* § 1382c(a)(3)(B). The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

> To summarize, the ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the [R]egulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the [R]egulations; at step four, whether the claimant can perform [his] past work given the limitations caused by [his] medical impairments; and at step five, whether the claimant can perform other work.

> The first four steps create a series of hurdles for claimants to meet. If the ALJ finds that the claimant has been working (step one) or that the claimant's medical impairments do not meet the severity and duration requirements of the [R]egulations (step two), the process ends with a finding of "not disabled." At step three, the ALJ either finds that the claimant is disabled because [his] impairments match a listed impairment [*i.e.*, a listing in 20 C.F.R. pt. 404, subpt. P, app. 1 ("the Listings")] or continues the analysis. The ALJ cannot deny benefits at this step.

> If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity ["RFC"], which is "the most" the claimant "can still do despite" physical and mental limitations that affect [his] ability to work. [20 C.F.R.] § 416.945(a)(1).[2] To make this assessment, the ALJ must "consider all of [the claimant's] medically determinable impairments of which [the ALJ is] aware," including those not labeled severe at step two. *Id.* § 416.945(a)(2).[3]

---

[2] *See also* 20 C.F.R. § 404.1545(a)(1).

[3] *See also* 20 C.F.R. § 404.1545(a)(2).

The ALJ then moves on to step four, where the ALJ can find the claimant not disabled because [he] is able to perform [his] past work. Or, if the exertion required for the claimant's past work exceeds [his] [RFC], the ALJ goes on to step five.

At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that "exists in significant numbers in the national economy," considering the claimant's [RFC], age, education, and work experience. *Id.* §§ 416.920(a)(4)(v); 416.960(c)(2); 416.1429.[4] The Commissioner typically offers this evidence through the testimony of a [VE] responding to a hypothetical that incorporates the claimant's limitations. If the Commissioner meets her burden, the ALJ finds the claimant not disabled and denies the application for benefits.

*Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015).

## C. ALJ's Findings

Plaintiff was 28 years old on the alleged onset date of disability and 30 years old on the date of the hearing. *See, e.g.*, Tr. 167 ¶ 7; 179. The ALJ found that plaintiff is illiterate. Tr. 167 ¶ 8. Adopting the testimony of the VE (*see* Tr. 190), the ALJ also found that plaintiff had past relevant work as a construction worker (Tr. 167 ¶ 6).

The ALJ found that plaintiff met the insured status requirements under the Act through 31 December 2014. Tr. 161 ¶ 1. Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ then found at step one that plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. Tr. 161 ¶ 2. At step two, the ALJ found that plaintiff has the following medically determinable impairments that are severe within the meaning of the Regulations: multiple sclerosis, functional illiteracy, borderline intellectual functioning, and major depression. Tr. 161 ¶ 3. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals any of the Listings, including Listing 12.05C for intellectual disability. Tr. 162 ¶ 4.

---

[4] *See also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c)(2), 404.929.

The ALJ next determined that plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).[5] Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day except that the claimant can never balance or climb ladders, ropes, or scaffolds, and must avoid workplace hazards. As the claimant is functionally illiterate, he is limited to simple, repetitive, routine tasks and low production quotas. He cannot work in coordination with others or with the general public and can only occasionally work in proximity with others.

Tr. 164 ¶ 5.

Based on her determination of plaintiff's RFC, the ALJ found at step four that plaintiff was unable to perform his past relevant work. Tr. 167 ¶ 6. At step five, the ALJ accepted the testimony of the VE and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of paper finishing machine operator (DOT #649.686-022), leather coater/hand finisher (DOT #584.687-010), and paper shredder (DOT #530.686-018). Tr. 167-68 ¶ 10. The ALJ accordingly concluded that plaintiff was not disabled from the alleged disability onset date, 14 July 2012, through the date of the decision, 13 February 2015. Tr. 168 ¶ 11.

## II.     STANDARD OF REVIEW

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456

---

[5] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," 1991 WL 688702. "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. §§ 404.1567, 416.967.

(4th Cir. 1990).  Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld.  *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It is more than a scintilla of evidence, but somewhat less than a preponderance.  *Id.*

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence.  *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992).  In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility.  *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979).  A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion.  *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).  "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator."  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## III.    OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff contends that the ALJ's decision should be reversed or, alternatively, that this case should be remanded for a new hearing on the grounds that the ALJ erred by failing to

properly evaluate whether plaintiff meets Listing 12.05C, and to identify and obtain a reasonable explanation for a conflict between the testimony of the VE and the DOT. The court will address each contention in turn.

## IV.    ALJ'S DETERMINATION ON LISTING 12.05C

### A.    Applicable Legal Principles

The Listings consist of impairments, organized by major body systems, that are deemed sufficiently severe to prevent a person from doing any gainful activity. 20 C.F.R. §§ 404.1525(a), 416.925(a). Therefore, if a claimant's impairments meet a listing, that fact alone establishes that the claimant is disabled. *Id*. §§ 404.1520(d), 416.920(d). An impairment meets a listing if it satisfies all the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); Soc. Sec. R. 83-19, 1983 WL 31248, at *2 (1983). The burden of demonstrating that an impairment meets a listing rests on the claimant. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

Even if an impairment does not meet the listing criteria, it can still be deemed to satisfy the listing if the impairment medically equals the criteria. 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5). To establish such medical equivalence, a claimant must present medical findings equal in severity to all the criteria for that listing. *Sullivan*, 493 U.S. at 531; 20 C.F.R. §§ 404.1526(a), 416.926(a). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

To satisfy Listing 12.05C for intellectual disability,[6] a claimant must meet three requirements. *See Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). One, he must satisfy

---

[6] Listing 12.05 reads in relevant part:

the introductory diagnostic description for intellectual disability ("diagnostic description requirement"). *See* Listing 12.00A. Specifically, the claimant must demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," that is, before the age of 22. Listing 12.05. General intellectual functioning may be defined by the intelligence quotient ("IQ") obtained using one or more of the standardized, individually administered intelligence tests. *See* DSM-IV-TR 41.[7]

---

12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . . .
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
OR
D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
1. Marked restriction of activities of daily living;
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

Listing 12.05C & D (formatting altered from original). Effective 3 September 2013, the Social Security Administration substituted the term "intellectual disability" for the term "mental retardation" in the Regulations, including the Listings. *See* 78 Fed. Reg. 46,499-01, 2013 WL 3936340 (Soc. Sec. Admin. 1 Aug. 2013).

[7] "The DSM is widely recognized as the authoritative reference used in diagnosing mental disorders." *United States v. Wooden*, 693 F.3d 440, 452 n.4 (4th Cir. 2012) (internal quotation marks omitted). "The definition of M[ental] R[etardation] we [*i.e.*, the Social Security Administration] use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations," including the definition in the DSM. *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 Fed. Reg. 20018–01, 2002 WL 661740, at *20022 (Soc. Sec. Admin. 24 Apr. 2002). The court notes that the current version of the DSM, the fifth edition ("DSM-5"), that was issued in May 2013, contains diagnostic criteria for intellectual disability different from those in the DSM-IV. *Compare* DSM-5 at 33 *with* DSM-IV-TR 49. Although corresponding changes were made to Listing 12.05 in an amendment effective 17 January 2017, the amendment is applicable only to Social Security cases with application filing dates after the date of the amendment. Accordingly, the prior version in effect at the time of the ALJ decision is set forth herein. Moreover, the Social Security Administration has previously explained that this version of the Listing 12.05 diagnostic description of mental retardation was based on not only the American Psychiatric Association's definition in the DSM-IV, but also on the definitions used by three other leading professional organizations and that it does not "seek to endorse the methodology of one professional organization over another." *Technical Revisions*, 2002 WL 661740, at 20022. For this reason, the court concludes that it remains appropriate to reference the diagnostic criteria in the DSM-IV-TR in evaluating application of Listing 12.05C in this

Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV-TR 42. Areas in which deficits in adaptive functioning may exist include "communication, self-care, home living, social/inter-personal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) and reciting areas of adaptive functioning listed in DSM-IV-TR 49). By specifying "deficit*s*" in adaptive functioning, the diagnostic description requires that there be at least two. Listing 12.05 (emphasis added); *see Hightower v. Colvin*, Civ. Act. No. 1:14-cv-02761-RBH, 2015 WL 5008713, at *7 (D.S.C. 20 Aug. 2015). This requirement is consistent with the definition of mental retardation in the DSM-IV-TR, which requires deficits or impairments in "at least two" of the foregoing areas. DSM-IV-TR 49.

In order to meet Listing 12.05C, in addition to satisfying the diagnostic description requirement, a claimant must meet the two requirements relating to the severity of the intellectual disability in Paragraph C. Specifically, a claimant must demonstrate both a "valid verbal, performance, or full scale IQ of 60 through 70" (*i.e.*, "the IQ requirement") and "a physical or other mental impairment imposing an additional and significant work-related limitation of function" (*i.e.*, "the additional impairment requirement"). Listing 12.05C.

### B. Analysis

The ALJ's finding regarding Listing 12.05C reads as follows:

---

case. *See Hightower v. Comm'r of Soc. Sec. Admin.*, No. 1:14-2761-RBH-SVH, 2015 WL 5008668, at *17 (D.S.C. 12 June 2015) ("Listing 12.05 was not updated to reflect the changes present in DSM-5, which calls into question the general applicability of DSM-5 to evaluation of intellectual disability under the Listing."), *rep. & recomm. adopted*, 2015 WL 5008713, at *8 (20 Aug. 2015).

Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. (Exhibit 6F).

Tr. 163 ¶ 4.  The exhibit cited by the ALJ is the 12 September 2012 consultative examination of

plaintiff performed by psychologist Reuben J. Silver, Ph.D. (Tr. 464-66).

The ALJ summarized Dr. Silver's report as follows:

Dr. Reuben Silver performed a consultative examination on the claimant in September 2012. (Exhibit 6F).  On presentation, the claimant was noted to be pleasant, friendly, and cooperative.  The claimant reported a recent hospital stent stemming from waking up and being unable to see, walk, or talk.  At this examination, the claimant could not tell Dr. Silver a definitive diagnosis.  He complained of back pain and migraine headaches.  The claimant indicated that he last worked a couple of months prior to this examination, and that he quit not due to any physical problems, but because there was no work for him to do.  As of this examination, the claimant was living with his parents, both of whom work, and his grandmother.  Regarding his activities of daily living, the claimant stated that he prepares simple meals for himself and watches television.  He stated that he has few friends because he keeps to himself.  No significant findings were noted on mental status examination.

Dr. Silver performed psychological testing and determined that the claimant has a full-scale IQ of 71, which is in the borderline range.  Dr. Silver indicated that the claimant is likely somewhere in the borderline category of intelligence but that with nonverbal tasks he is very close to average.  No Axis I diagnosis was given; Dr. Silver did assess the claimant with borderline intelligence.  He noted that, while the claimant had not been working, this was because he could not find work; he noted that the claimant had been working successfully as a roofer on and off for years.   Dr. Silver reiterated that, while the claimant is borderline, intellectually, there are tasks he would be able to perform at a close to average level, such as the work he has performed in the past.  He noted that the claimant's intellectual condition should not prevent him from working, and stated that the claimant should have his physical condition evaluated.  In Dr. Silver's opinion, the claimant would be able to handle benefit payments if awarded to him.

Tr. 166 ¶ 5.  The ALJ gave Dr. Silver's opinions significant weight:  "The undersigned has given

this assessment significant weight, as it is consistent with the remaining evidence of record and

with the above [RFC]."  Tr. 166 ¶ 5.

Plaintiff contends that the ALJ erred, in part, by not finding that plaintiff met the IQ requirement of Listing 12.05C based on the verbal IQ score of 68 Dr. Silver obtained for plaintiff. *See* Tr. 465. Dr. Silver's report, however, makes clear that he did not consider that score to be a valid indicator of plaintiff's intellectual capacity. Instead, as the ALJ's summary of Dr. Silver's report indicates, Dr. Silver found plaintiff to be functioning at the borderline level, but in some areas at close to average. By citing Dr. Silver's report immediately after his Listing 12.05C finding and attributing "significant weight" to Dr. Silver's assessment, the ALJ was clearly adopting Dr. Silver's opinion regarding the validity of the verbal score of 68.

The ALJ's rejection of the verbal score of 68 was proper. "[A]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." *Hancock v. Asture*, 667 F.3d 470, 474 (4th Cir. 2012). An ALJ may reject such an IQ score if there is sufficient evidence contradicting it. *Id.* at 475. Here, such evidence includes Dr. Silver's report. *See id.* (upholding ALJ's rejection of an IQ score based, in part, on notes of a treating physician).

In addition, there is "the extent of the claimant's daily activities," which the ALJ cited as a basis for rejecting plaintiff's allegations of disability. Tr. 167 ¶ 5; *see Hancock*, 667 F.3d at 475 (upholding ALJ's rejection of an IQ score based, in part, on the claimant's actual functioning). The ALJ described these activities as follows:

> The claimant is able to help care for, and spend time with, his young daughter. He can prepare simple meals for himself and care for his own personal needs. The claimant enjoys watching television. The claimant has stated that he can drive a car, is a good cook, and is a good father. (Exhibit 12F).

Tr. 162 ¶ 4.

Notably, in applying the Paragraph D criteria of Listing 12.05,[8] the ALJ found plaintiff to have only mild limitations in activities of daily living. Tr. 162 ¶ 4. Plaintiff does not expressly challenge this finding.

In support of his contention regarding plaintiff's verbal IQ score of 68, plaintiff cites to *Leftwich v. Colvin*, No. 1:13CV00414, 2016 WL 126753, at *8 (M.D.N.C. 11 Jan. 2016), *mem. op. & recomm. adopted*, J. (D.E. 18) (16 Feb. 2016). That case, however, in inapposite. There, the court found it error for the ALJ to have relied on a report by a consulting psychologist or psychiatrist finding the claimant to be at the borderline functioning level based on an IQ score that was not the lowest among the scores obtained. 2016 WL 126753, at *8. Here, however, Dr. Silver did not base his diagnosis on a particular score, but on consideration of all the scores and additional information. *See* Tr. 465-66.

Further, the examiner in *Leftwich* there found the scores obtained to be valid. 2016 WL 126753, at *5. Dr. Silver made no such finding. Indeed, to the contrary, his report impeaches the score of 68 obtained. *See* Tr. 465-66.

Plaintiff also challenges the ALJ's apparent determination that he failed to satisfy the additional limitation requirement of Listing 12.05C. The Commissioner concedes that plaintiff does meet this requirement. The issue is moot, however, because, as discussed, to meet Listing 12.05C a claimant must meet all three criteria of the listing—the diagnostic description requirement, IQ requirement, and additional limitation requirement. Therefore, the ALJ's proper determination that plaintiff did not meet the IQ requirement precludes him from meeting the listing irrespective of whether plaintiff meets the additional limitation requirement. Accordingly,

---

[8] These criteria are the same as those in the special technique for the evaluation of mental impairments under the Regulations, 20 C.F.R. §§ 404.1520a, 416.920a.

even if the ALJ is deemed to have erred with respect to the additional limitation requirement, [9] the error is harmless.  *See*, *e.g.*, *Garner v. Astrue*, 436 F. App'x 224, 226 n* (4th Cir. 2011) (applying *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

The court concludes that plaintiff's challenge to the ALJ's determination on Listing 12.05C fails.  The court accordingly rejects it.

## V.    CONSISTENCY OF THE VE'S TESTIMONY WITH THE DOT

### A.    Applicable Legal Principles

Social Security Ruling 00-4p requires that an ALJ inquire about and resolve in his decision conflicts between a VE's testimony and the DOT:

> Occupational evidence provided by a VE or VS [*i.e.*, vocational specialist] generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict.  The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

> . . . .

> . . . The adjudicator will explain in the determination or decision how he or she resolved the conflict.  The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

Soc. Sec. R. 00-4p, 2000 WL 1898704, at *2, 4 (4 Dec. 2000).

---

[9] Given the wording of the ALJ's finding on Listing 12.05C, it is not entirely clear whether she found plaintiff not to meet both the IQ requirement and the additional limitation requirement, or the IQ requirement alone.  Any such ambiguity is moot for the reasons stated.

### B.     Analysis

As noted, the VE testified that plaintiff could perform jobs in the occupations of paper finishing machine operator (DOT #649.686-022), leather coater/hand finisher (DOT #584.687-010), and paper shredder (DOT #530.686-018).  Tr. 168 ¶ 10.  The hypothetical that elicited this testimony included the limitation that the individual was "functionally illiterate."  Tr. 191.  The Regulations define "illiteracy" as follows:

> Illiteracy means the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  This limitation in the hypothetical was consistent with the ALJ's inclusion in her RFC determination of the specification that plaintiff is functionally illiterate.  Tr. 164 ¶ 5 ("As the claimant is functionally illiterate . . . .").  The ALJ had previously found functional illiteracy to be a severe impairment of plaintiff's.  Tr. 161 ¶ 3.  The ALJ asked the VE whether his testimony was consistent with the DOT, and she stated that it was.  Tr. 192.

Plaintiff argues that the VE's testimony was actually not consistent with the DOT.  His argument is based on the fact that each of the occupations the VE found the hypothetical individual capable of performing has a language development level of 1.  This level includes the reading abilities to:  "Recognize meaning of 2,500 (two- or three-syllable) words.  Read at rate of 95-120 words per minute.  Compare similarities and differences between words and between series of numbers."  DOT, app. C, § III, "01 Language Development, Reading."  Thus, the limitation of functional illiteracy purportedly conflicts with the langauge development level required for the occupations the VE found the hypothetical individual capable of performing.  No such conflict was, of course, indentified during the hearing or explained in the ALJ's decision.

Plaintiff's contention is baseless. One reason is that the "DOT lists maximum requirements of occupations as generally performed." Soc. Sec. R. 00-4p, 2000 WL 1898704, at *3. Thus, language development level 1 encompasses illiteracy up to the specified abilities in word meaning recognition, reading rate, and making comparisons. Common sense dictates this conclusion. Language development level 1 is the lowest language development level. Plaintiff's interpretation that language development level 1 requires reading at the ability levels specified would mean that no jobs would be available to illiterate individuals.

Indeed, the Regulations expressly recognize that jobs are available to illiterate individuals:

> While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. Similarly, the lack of relevant work experience would have little significance since the bulk of unskilled jobs require no qualifying work experience. The capability for light work, which includes the ability to do sedentary work, represents the capability for substantial numbers of such jobs. This, in turn, represents substantial vocational scope for younger individuals (age 18–49) even if illiterate or unable to communicate in English.

20 C.F.R. pt. 404, subpt. P, app. 2, Medical-Vocational Guidelines,[10] § 202.00(g); *see also* Medical-Vocational Guidelines, Rule 202.16 (rule used as framework for ALJ's decision making on plaintiff's claim which directs a determination of "not disabled" if applied directly and covers individuals who can perform light work and are "illiterate or unable to communicate in English").

---

[10] The Medical–Vocational Guidelines or grids are a set of rules that, when applied directly, specify a conclusion as to whether or not a claimant is disabled. *See generally* Medical-Vocational Guidelines § 200.00(a). They may also be used as a framework for decision making, as here. The Medical-Vocational Guidelines are grouped by RFC for sedentary, light, medium, and heavy or very heavy work, respectively. Within each such RFC grouping, the criteria applied are the vocational factors—namely, age, education, and previous work experience (*e.g.*, none, unskilled, semiskilled, skilled, transferability of skills).

Further, each of the occupations identified by the VE has a specific vocational preparation ("SVP") level of 1. SVP refers to "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, app. C, § II, "Specific Vocational Preparation (SVP)." SVP level 1 requires a "[s]hort demonstration only." *Id.* That SVP level is consistent with illiteracy.

The tasks comprising each of the occupations as described in the DOT definitions are also consistent with illiteracy. For the occupation of paper finishing machine operator, the tasks are: "Feeds preformed bodies of paper cups into machine that automatically inserts plugs into lower ends to form bottoms, rolls tops to finish edges of cups, and ejects completed cups." DOT #649.686-022. For leather coater/hand finisher, the tasks are: "Spreads premixed solutions, such as dope, grease, or lacquer, on leather, using applicator, to finish or waterproof leather. Positions coated leather on conveyor belt to move leather through drying oven." DOT #584.687-010. And for paper shredder, the tasks are: "Feeds waste paper into machine that cuts paper into small pieces for use as building insulation. Fills sack with cut paper." DOT #530.686-018.

The court concludes that the VE's testimony was consistent with the DOT. It accordingly rejects plaintiff's contention of an alleged inconsistency and therefore failure by the ALJ to resolve an inconsistency.

## VI. CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that the Commissioner's motion (D.E. 23) for judgment on the pleadings be ALLOWED, plaintiff's motion (D.E. 21) for judgment on the pleadings be DENIED, and the Commissioner's final decision be AFFIRMED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until 15 August 2017 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.  *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).**

Any response to objections shall be filed within 14 days after the filing of objections.

This 1st day of August 2017.

James E. Gates
United States Magistrate Judge